# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BELL TELEPHONE COMPANY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> EDWARD C. HURLEY, Chairman, ) <br> ERIN M. O'CONNELL-DIAZ, LULA M. FORD, ) <br> ROBERT F. LIEBERMAN and ) <br> KEVIN K. WRIGHT, ) <br> in Their Official Capacities as Commissioners ) <br> Of the Illinois Commerce Commission and ) <br> Not as Individuals, ) <br> ) <br> Defendants, ) <br> ) <br> and ) <br> ) <br> ACCESS ONE, INC., et al.; COVAD ) <br> COMMUNICATIONS CO., et al.; DATA NET ) <br> SYSTEMS, L.L.C., et al., GLOBALCOM, INC.; ) <br> and MCIMETRO ACCESS TRANSMISSION ) <br> SERVICES LLC, ) <br> ) <br> Defendants/Intervenors. ) | Case No. 05 C 1149 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Illinois Bell Telephone Company ("SBC") has brought suit challenging determinations made by the Illinois Commerce Commission ("ICC") that require SBC to provide its competitors, including defendants/intervenors (the "Competing Carriers"), with access to certain portions of SBC's network. Presently before the court is SBC's motion for a preliminary injunction requesting relief from an ICC order pending this court's consideration of the merits of SBC's complaint. For the reasons set forth below, that motion is denied.

## I. BACKGROUND

Until the 1990s, the market for local telephone service was widely viewed as a natural monopoly. The federal Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 *et seq.*,

sought to promote competition in that market by requiring established telephone service providers ("incumbent local exchange carriers" or "ILECs") to provide new market entrants ("competing local exchange carriers" or "CLECs") with access to certain portions of the ILECs' networks ("network elements") at a fair price, a process known as "unbundling." The rationale for this requirement was that new entrants could not be expected to compete immediately with the infrastructure that ILECs had built up over years of operating as legally sanctioned monopolies. *See Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 382 (7th Cir. 2004). The Act tasks the Federal Communications Commission ("FCC") with determining which network elements should be unbundled, requiring the FCC to "consider, at a minimum, whether – (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d)(2).

Prior to the passage of the Act, several states, including Illinois, already had taken steps to promote local telephone competition. SBC, an Illinois ILEC that previously had been regulated by the state using a traditional "rate of return"[1] framework, petitioned for an alternative form of regulation with fewer earnings restrictions to enable it to respond to the advent of new local competition. In exchange for this alternative regulation, SBC agreed to open up portions of its network to its new competitors.

Section 13-801 of the Illinois Public Utilities Act (the "Illinois Act"), 220 ILCS § 5/1-101,

---

[1] This form of regulation, often used with public utilities to stop them from exploiting monopoly power, capped the rates SBC could charge at an amount necessary to recoup costs and provide a "reasonable" rate of return on SBC's equity.

*et seq.*, sets forth the obligations of ILECs that have opted for alternative regulation status.[2] On June 11, 2002, the ICC issued an order further specifying SBC's obligations under Section 13-801. *See generally Ill. Bell. Filing to Implement the Public Utils. Act*, Doc. No. 01-0614, 2002 Ill. PUC LEXIS 564 (Ill. Comm. Comm'n June 11, 2002). SBC brought suit in this court two months later, arguing among other things that the federal Act preempted the ICC order because the order imposed unbundling requirements absent an FCC determination that denial of access would "impair" a CLEC's ability to compete.

At SBC's request, this court suspended briefing on the preemption claims until the FCC issued its August 13, 2003 Triennial Review Order ("TRO"). *See* 18 FCC Rcd. 16978 (F.C.C. rel. Aug. 21, 2003). The TRO set forth a new regulatory policy in response to court criticism of the FCC's earlier efforts to implement unbundling requirements, *see United States Telecom Ass'n v. FCC*, 290 F.3d 415, 422 (D.C. Cir. 2002) ("*USTA I*"), and specifically mandated that state regulatory agencies review and amend their decisions to conform to the new federal regulatory framework. The ICC accordingly reopened proceedings examining Section 13-801, and requested that this court "remand" the case to the ICC while the commission completed its review. The court granted the ICC's request on May 17, 2004. *Ill. Bell. Tel. Co. v. Wright*, No. 02 C 6002, Doc. No. 66 (N.D. Ill. May 17, 2004).

SBC is back in court because of additional recent changes to the federal regulatory framework. The parties' current dispute arises out of the ICC's requirement that SBC provide its competitors with unbundled access to mass market local circuit switching and a platform of network

---

[2] As a practical matter, Section 13-801 applies only to SBC because it is the only Illinois ILEC that has opted for alternative regulation.

elements commonly referred to as UNE-P.[3] This requirement was not directly at issue in the previous proceeding because the FCC required ILECs to provide mass market switching at that time. However, the D.C. Circuit in *United States Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) ("*USTA II*") subsequently rejected that requirement. In response to *USTA II*, the FCC issued a Triennial Review Remand Order ("TRO Remand Order") on February 4, 2005. *See* 2005 WL 289015 (FCC Feb. 4, 2005). The TRO Remand Order states that ILECs no longer have an obligation to provide CLECs with additional access to mass market local circuit switching, and provides a 12 month transition period for existing CLEC customers for whom service is provided via UNE-P. TRO Remand Order ¶ 199. The FCC found that removal of the unbundling requirement was justified because newer, more efficient switching technologies are now widely available and continued dependence on the ILECs' infrastructure negatively affects incentives to invest in new technologies. *Id*.

Shortly after the TRO Remand Order issued, SBC sent a series of "Accessible Letters" to Illinois CLECs, informing them that as of March 11, 2005 (the effective date of the order), SBC would refuse new requests for unbundled mass market local switching. After several CLECs questioned the validity of SBC's "unilateral implementation" of the TRO Remand Order, SBC brought this suit seeking a declaration that the FCC's order allows SBC to stop providing mass market switching as an unbundled network element. The Competing Carriers oppose SBC's present request for a preliminary injunction on the merits, while the ICC, through its commissioners, argues that it should be allotted time to finish considering the effect of the TRO before this court takes any

---

[3] Switches are specialized computers that direct calls to their destinations; that is, the devices that "make the connection" when one places a call. UNE-P (unbundled network element-platform) consists of switches, local loops (the "last mile" of wire that connects switches to telephones) and transport facilities (equipment that directs calls between switches).

action.

## II. ANALYSIS

Because the ICC has raised questions of standing and abstention, the court will address the ICC's arguments before proceeding to the merits of SBC's request. The ICC opposes SBC's motion because the ICC has not yet completed the review contemplated by this court's May 17, 2004 remand order. Specifically, the ICC argues that SBC is trying to circumvent that order by returning to federal court, that SBC's claims are unripe because the ICC has yet to take final action, and that SBC has failed to exhaust its administrative remedies. The court disagrees. Although SBC's complaint raises many of the same issues that were before this court in the previous action, SBC now seeks preliminary relief based solely on a federal order issued subsequent to the TRO that the ICC currently is considering. The ICC maintains that it has "bifurcated" its proceedings to address the new federal unbundling rules SBC is relying on, and that the ICC will deal with those questions as part of "Phase II" of those proceedings in due course once Phase I has completed. But this new and separate "phase" of proceedings was not contemplated by the court's May 17, 2004 order, so the court does not see how SBC could be circumventing the court's prior directive by seeking new relief pursuant to new federal rules.[4]

---

[4] The ICC also argues briefly that the court should abstain from reaching the merits of the preliminary injunction arguments out of concerns for "comity and federalism." While the ICC correctly notes that the Supreme Court has sanctioned abstention in favor of pending state administrative proceedings on two occasions, "it has never been suggested that [comity] requires deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989). The court does not believe that the parties' preliminary injunction arguments present an exceptional circumstance warranting abstention.

The court similarly rejects the ICC's argument that SBC's claims are "unripe" because there is no final agency action to consider. The parties do not dispute that SBC has been operating under the ICC's June 11, 2002 order and must continue to obey that order. The very reason SBC has come to court is because it maintains that the recent TRO Remand Order preempts a portion of the state regulations under which it currently must operate. In other words, SBC is seeking review of an administrative decision that has been sufficiently "formalized" to have its effects felt "in a concrete way by the challenging part[y]." *Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004). Finally, the court finds that, to the extent that SBC was required to exhaust its administrative remedies with the ICC before seeking a preliminary injunction, it has done so. SBC filed an emergency petition with the ICC requesting action after the TRO Remand Order was issued, which the ICC denied two days before the TRO Remand Order was to take effect. Accordingly, the court will consider the merits of the parties' preliminary injunction arguments.

### A. Legal Standard.

A party seeking a preliminary injunction has "the burden of demonstrating that it has a reasonable likelihood of success on the merits of its underlying claim, that it has no adequate remedy at law, and that it will suffer irreparable harm without the preliminary injunction." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 803 (7th Cir. 2002). If the moving party meets these requirements, the court then considers "any irreparable harm the preliminary injunction might impose upon [non-movants] and whether the preliminary injunction would harm or foster the public interest." *Id*. at 803-04. In weighing the parties' respective harms, "the court bears in mind that the purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Id*. at 804 (internal citation omitted).

### B. Likelihood of Success on the Merits.

The 1996 Telecommunications Act contains "an unusual–and unequal–blending of federal and state authority." *Ind. Bell Tel. Co. v. Ind. Util. Regulatory Comm'n*, 359 F.3d 493, 494 (7th Cir. 2004). Although state utility commissions have a role in carrying out the Act, "Congress 'unquestionably' took 'regulation of local telecommunications competition away from the State' on all 'matters addressed by the 1996 Act'; it required that the participation of the state commissions in the new federal regime be guided by federal-agency regulations." *Id.* (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999)). SBC argues that the FCC's determination of the network elements to be unbundled pursuant to Section 251(d)(2) of the Act is one of the most significant components of the federal regime, and that the ICC's order therefore must yield to the FCC's recent finding that "[i]ncumbent LECs have no obligation to provide competitive LECs with unbundled access to mass market local switching." TRO Remand Order ¶ 5. The parties do not dispute that the TRO Remand Order and the ICC's June 11, 2002 order command different results with respect to the provision of mass market switching and UNE-P, but the Competing Carriers nevertheless argue that the ICC's order is not preempted and that, even if it is, the TRO Remand Order does not countenance the "unilateral" implementation attempted in SBC's Accessible Letters.

#### 1. Preemptive Effect of the TRO Remand Order.

The Competing Carriers first argue that Illinois law does not impose any mandatory requirements that conflict with federal law because SBC voluntarily agreed to the provisions of Section 13-801 of the Illinois Act (and the subsequent ICC order) as a *quid pro quo* when it opted for the benefits of alternative regulation status. As both SBC and the Competing Carriers have observed, Section 13-801 does not apply to Verizon, another Illinois ILEC that has not sought

alternative regulation under Illinois law. According to the Competing Carriers, "SBC is free to end both its alternative regulation status, and the obligations that go along with it, any time it chooses to do so." Competing Carriers' Opp. Br. at 13.

SBC contends that when it sought alternative regulation status it could not possibly have foreseen the ICC's June 11, 2002 order. SBC focuses on the fact that it never explicitly signed away its future federal rights, but this argument ignores the Competing Carriers' main point, which is that the state requirements were not mandatory. SBC's better argument is that, now that SBC has opted for alternative regulation, it cannot act unilaterally to get out of that regulatory scheme, an argument the Competing Carriers impliedly concede when they recommend that SBC "simply petition the ICC for an end to its alternative regulation status." *Id*.

Unfortunately, none of the parties has explained what petitioning the ICC for an end to alternative regulation would entail. SBC maintains that it would be required to proceed under its current regulatory plan until the ICC approves a new one, but this does not provide the court with any indication as to the likelihood of approval, how long the process would take, or even what the approval process might look like. The court imagines that this process would take some time and that the requirements of Section 13-801 would remain mandatory during the transition, but it may well be the case, as the Competing Carriers suggest, that renouncing alternative regulation status is merely *pro forma* and can be done immediately. In any event, the court is reluctant to make a definitive assessment of the preemption question at this point, based on the possibility that the ICC requirements of which SBC complains were voluntarily assumed and can be voluntarily abrogated, an issue which the present record only superficially addresses. *See Clinton v. Jones*, 520 U.S. 681, 690 (1997) ("[W]e have often stressed the importance of avoiding the premature adjudication of

constitutional questions.") (citing *Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)("[W]e have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law."))

The Competing Carriers also argue that a finding of preemption is premature because the FCC did not state explicitly that state commissions are preempted from making unbundling determinations. In a portion of the TRO undisturbed by *USTA II*, the FCC noted that states are not "preempted from regulating in [the area of unbundled network elements] as a matter of law." TRO ¶ 192. Rather, the FCC invited parties to seek a declaratory ruling to determine if a state unbundling requirement is inconsistent with the federal regime. *Id*. at ¶ 195. SBC has not petitioned the FCC for a ruling regarding the Illinois UNE-P unbundling requirements.

SBC argues that the FCC's invitation to seek a declaratory ruling does not strip this court of jurisdiction to determine the preemption question. This is almost certainly the case, as the FCC's invitation is permissive rather than mandatory. *Id*. However, the FCC's decision not to declare that state law unbundling requirements are preempted weakens SBC's preemption argument, albeit only slightly. In the TRO, the FCC observed that "[i]f a decision pursuant to state law were to require the unbundling of a network element for which the Commission has either found no impairment ... or otherwise declined to require unbundling on a national basis, we believe it unlikely that such decision would fail to conflict with and 'substantially prevent' implementation of the federal regime." *Id*. This language suggests that there is a *possibility* that a state unbundling requirement would not be preempted, although a modest one, and the court does not believe that it would exist in the present case. *Accord Ind. Bell. Tel. Co.*, 362 F.3d at 395 ("[W]e observe that only in very limited circumstances, which we cannot now imagine, will a state be able to craft [an unbundling]

requirement that will comply with the Act."). The court finds that, while the preemption question is not as clear as SBC suggests, the likelihood of success on this issue favors SBC.

### 2. Implementation of the Order.

The Competing Carriers argue that even if the TRO Remand Order is applicable, the FCC still requires that the parties implement the requirements via negotiation rather than unilateral action by an ILEC. The TRO Remand Order provides that "the incumbent LEC and competitive LEC must negotiate in good faith regarding any rates, terms, and conditions necessary to implement our rule changes." TRO Remand Order ¶ 233. Additionally, the TRO Remand Order provides a 12 month transition period for the CLECs' existing customers that are provided with service via UNE-P, during which time ILECs and CLECs are to "modify their interconnection agreements, including completing any change of law process." *Id*. at ¶ 227. Therefore, according to the Competing Carriers, federal law does not support the "immediate" relief that SBC requests by way of an injunction.

SBC responds that the requirement that the parties negotiate their interconnection agreements in Paragraph 227 of the TRO Remand Order is applicable only to the "embedded base" of existing customers rather than new customers. SBC has the better of this issue, because that paragraph sets forth a transition plan for moving existing customers away from UNE-P; it does not appear to contemplate new customers. SBC maintains that it is "nonsensical" to think that the FCC would countenance additional new UNE-P arrangements while at the same time providing a discrete time period for CLECs to transition off their existing customer base. According to SBC, the fact that the TRO Remand Order took effect on March 11, 2005 and is "self-effectuating," TRO Remand Order ¶ 3, justifies its unilateral action.

Although the court agrees that the TRO Remand Order does not require ILECs to engage in protracted negotiations simply to stop doing what the FCC has said they are no longer required to do, the court is troubled by SBC's view that it can alter the partes' arrangements unilaterally and without meaningful notice. Unlike Paragraph 227, Paragraph 233 of the TRO Remand Order does not address only existing customers. Rather, it falls under the general heading of "Implementation of Unbundling Decisions" and mandates that the parties "negotiate in good faith regarding *any* rates, terms, and conditions necessary to implement" the rule changes. This requirement presumably would include the substantially increased rate SBC now wishes to charge the CLECs seeking access to SBC's switches. SBC has denied that its actions constitute bad faith because: 1) many of the Competing Carriers participated in the "rulemaking" that resulted in the TRO Remand Order; 2) it issued the "Accessible Letters" a month before it intended to stop provision of UNE-P; 3) it filed a petition with the ICC and "served notice on a host of [common] carriers"; and 4) it served notice on interested competitors that it was bringing the present action and did not oppose their motions to intervene. SBC Competing Carrier Reply Mem. at 9. To the extent that Paragraph 233 of the TRO Remand Order requires good faith negotiations, the court does not see how any these activities qualify.

The March 23, 2005 ICC "Amendatory Order," submitted by SBC as supplemental authority for the proposition that SBC is no longer required under the federal Act to provide UNE-P to new CLEC customers as of March 11, is not to the contrary. *See Cbeyond Communications, LLP v. Ill. Bell. Tel. Co.*, No. 05-0154 (Ill. Comm. Comm'n Mar. 23, 2005). In fact, that decision specifically recognized that the TRO Remand Order contemplates implementation of the new federal framework through negotiation rather than unilateral action. *Id*. at 6 ("[The Complainant CLECs] have

presented a fair question of whether the use of the unilateral Accessible Letters ... to modify the terms under which the parties presently transact business is authorized by the [TRO Remand Order]. Indeed, our preliminary conclusion is that the [TRO Remand Order] does not permit such self help.") Perhaps, as SBC suggests, it would be futile for the parties to sit down and negotiate as long as the preemption question has not been definitively resolved, but in this court's view that speculation does not excuse SBC from complying with the negotiation process. Paragraph 233 of the TRO Remand Order mandates that "the parties to the negotiating process will not unreasonably dely implementation of the conclusions adopted in this Order," strongly implying that the FCC envisioned negotiations as a predicate to implementation of the TRO Remand Order's requirements. Indeed, at least one of the Competing Carriers already has pledged that it will negotiate and implement the law changes "expeditiously and smoothly." In short, the Paragraph 233 negotiation provisions weaken SBC's claim that immediate injunctive relief is required to implement the TRO Remand Order.

### C. Irreparable Harm/Adequate Legal Remedy.

SBC urges that failure to enjoin the ICC's order will result in irreparable harm to the competitive marketplace and "frustrate the will of Congress and the FCC." Additionally, SBC maintains that it will continue to lose customers to CLECs who compete with SBC by reselling access to SBC's technology to consumers on terms no longer sanctioned by the FCC, citing *Merrill Lynch v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993) (upholding finding that solicitation and loss of clients "is a harm for which there is no adequate legal remedy"). Although the court recognizes that there is some disagreement as to when loss of customers constitutes irreparable harm, *see, e.g., Central & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C. Cir. 1985)

("revenues and customers lost to competition which can be regained through competition are not irreparable"), the court agrees with SBC that it will suffer irreparable harm because, even if its losses are quantifiable, there is no entity against which SBC could recover money damages. *Accord Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("threat of unrecoverable economic loss ... does qualify as irreparable harm"). The court therefore finds that SBC has demonstrated irreparable harm.

### D. Balance of Harms and Public Interest.

The Competing Carriers echo SBC's argument that loss of customers and goodwill amounts to irreparable injury. However, the Competing Carriers draw the distinction that, if the preliminary injunction is denied, public perception of SBC's competence will remain largely unchanged, while if the preliminary injunction is granted, the Competing Carriers will be forced to turn away potential new customers and will be unable to service existing customers insofar as they require new or additional services. As SBC's own Accessible Letters indicate, SBC intends to reject requests from the Competing Carriers to add new telephone lines to existing accounts (apparently a common request for small businesses served by UNE-P) or move local phone service to Competing Carriers' customers' new homes if they change addresses. The court agrees that the Competing Carriers have a legitimate apprehension that, if SBC's requested injunction is granted, their ability to service new customers, as well as their ability to address the needs of existing customers for normal and routine modifications of service, will be significantly impaired. Additionally, the Competing Carriers argue that if SBC is permitted to carry out its plan immediately to cut off their access to mass market local circuit switching, their relationships with large businesses could also be severely negatively impacted, because those businesses' satellite offices often are served via UNE-P. Thus, the Competing Carriers face serious reputational injury which, in some cases, could be of fatal

proportions.

The court agrees with the Competing Carriers that the loss of goodwill they face if SBC's requested injunction is granted is likely to be far more devastating than anything SBC faces if its requested injunction is denied. SBC may continue to lose customers and revenue to competition if it is required to provide UNE-P during the pendency of this litigation, but if the preliminary injunction issues, the Competing Carriers run a very real risk of being rendered incompetent, and perceived as being so, since they will be unable to deliver some of the basic services they are in business to provide. SBC counters that the Competing Carriers in fact have acted incompetently, or at least improvidently, by failing to plan after *USTA II* and subsequent FCC statements intimated that the end of the federal UNE-P requirement was near. But the federal regulatory framework has not been a model of clarity. As SBC itself notes, CLECs have been able to obtain UNE-P under every prior applicable FCC rule. On this record, it is hardly clear that the Competing Carriers' decision to wait for the ICC's determination of ILEC obligations in light of new federal law was unreasonable. The balance of harms strongly favors the Competing Carriers in this case.

Finally, the court considers the effect of SBC's requested relief on the public interest. SBC argues that the public interest is best served by providing relief that effectuates the "national policy" of eliminating mandated unbundled mass market switching. Granted, there is a strong public interest in providing the Illinois consumer with the technical innovation and competition which the FCC has predicted will result from the elimination of mandated unbundled switching. But SBC's requested relief would allow it, without meaningful notice and without meaningful negotiation, to cut off the Competing Carriers' access to what for them, at least in the short term, is an important resource. The innovation and competition which the FCC hoped to promote, and the public interest served thereby,

will not be promoted if SBC is permitted to use the FCC order to cut off its competitors' legs overnight.[5]

Moreover, if the requested preliminary injunction issues, there will be an immediate negative impact on individuals and small business owners currently doing business with the Competing Carriers. CLEC customers who want to add additional telephone or fax lines will be forced to change providers or deal with two providers simultaneously, and customers who move will be forced to switch their local telephone service provider entirely. Saddling the public with these transaction costs in order to permit SBC to take unilateral and immediate action, which may not have been what the FCC contemplated, is contrary to the public interest.

This court has no intention of delaying the resolution of this case. As long as this case moves expeditiously toward a resolution on the merits, neither the balance of harms, nor the public interest, favors SBC. Rather, both the balance of harms and the public interest favor the maintenance of the status quo, as long as the issues raised by SBC are resolved in an orderly fashion through negotiations, before the ICC, before the FCC, or by this court.

### III. CONCLUSION

Although the court concludes that likelihood of success on the preemption question favors SBC, the case for the allowance of unilateral and immediate cessation of SBC's provision of UNE-P

---

[5] SBC does not dispute the Competing Carriers' contention that at least some of SBC's sister ILECs have chosen to continue to provide UNE-P beyond the March 11 deadline. Moreover, a district court in Michigan recently granted a preliminary injunction in favor of a CLEC preventing SBC Michigan from refusing to provide UNE-P. *See Order Granting Preliminary Injunction*, *MCIMetro Access Transmission Serv. LLC v. Mich. Bell Tel. Co.*, No. 05-70885 (E.D. Mich. Mar. 11, 2005). The parties in that case settled before the judge could issue his formal written opinion, thus mooting the preliminary injunction. However, the fact remains that despite the March 11 effective date of the TRO Remand Order, UNE-P will still be provided in some places by ILECs for some period of time.

to the Competing Carriers is far weaker. The court further finds that while denial of preliminary relief threatens some harm to SBC, the threat of irreparable injury to the Competing Carriers if an injunction is granted is incomparably greater. Moreover, the court finds that as long as this case can move forward at an efficient pace, the public interest favors maintenance of the status quo and argues against the entry of an injunction. SBC's motion for a preliminary injunction is denied.

ENTER:

/s/
Joan B. Gottschall
United States District Judge

DATED: March 29, 2005