# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ILLINOIS BELL TELEPHONE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EDWARD C. HURLEY, ERIN M. CONNELL-DIAZ, LULA M. FORD, ROBERT F. LIEBERMAN, and KEVIN K. WRIGHT, in their official capacities as Commissioners of the Illinois Commerce Commission, | ) ) ) ) ) | Case No. 05 C 1149<br><br>Judge Joan B. Gottschall |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ACCESS ONE, INC. et al., | ) | |
| | ) | |
| Defendants-Intervenors. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Illinois Bell Telephone Company has filed a motion for summary judgment and seeking final declaratory judgment and permanent injunctive relief on the subject of those issues left outstanding following the court's orders of September 28, 2006 and April 17, 2007. Defendants Commissioners of the Illinois Commerce Commission and Defendants-Intervenors Access One et al. have filed cross-motions for summary judgment in their favor. For the reasons set forth below, Illinois Bell Telephone Company's motion is granted and Defendants' Defendants-Intervenors' cross-motions for summary judgment are consequently denied. The court accordingly enters final declaratory judgment in favor of Illinois Bell Telephone Company and modifies its

April 17, 2007 order granting injunctive relief to Illinois Bell Telephone Company as specified below.

## I. PROCEDURAL HISTORY

Plaintiff Illinois Bell Telephone Company (currently known as "AT&T Illinois") brought this suit against the defendants in their official capacities as commissioners of the Illinois Commerce Commission (the "ICC"), challenging, *inter alia*, § 13-801 of the Illinois Public Utilities Act ("§ 13-801" and the "IPUA," respectively). 220 Ill. Comp. Stat. Ann. 5/13-801 (2006). After AT&T Illinois filed suit, a number of competing local exchange carriers ("the Competing Carriers") were granted leave to intervene.[1] AT&T Illinois claims that § 13-801, the ICC's implementing regulations, and certain ICC-imposed tariffs are preempted by, and in violation of, the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 151 et seq. (2006), and the applicable Federal Communications Commission ("FCC") implementation regulations.

On September 28, 2006, the court granted partial summary judgment in favor of AT&T Illinois with respect to the majority of its claims (the "September 28th order"). *See Ill. Bell Tel. Co. v. O'Connell-Diaz*, No. 05 C 1149, 2006 WL 2796488, at *18 (N.D. Ill. Sept. 28, 2006). Specifically, the court held that a number of the requirements of § 13-801 were preempted by § 251 of the Act. *Id.* These included: (1) § 13-801's requirement that AT&T Illinois must unbundle certain network elements, including: (a) local circuit switching; (b) switching-related elements; (c) Ocn-level loops and dedicated transport; (d) dark fiber loops; (e) entrance facilities; (f) feeder subloops; (2) § 13-801's combination requirements compelling AT&T Illinois to provide competitors with pre-

---

[1] The Competing Carriers include: Globalcom, Inc., Covad Communications Co., Access One, Inc., CIMCO Communications, Inc., Forte Communications, Inc., Mpower Communications Corporation, Data Net Systems, L.L.C., TruComm Corporation, and Illinois Public Telecommunications Association.

2

existing combinations of network elements; (3) § 13-801's requirements with respect to splitters, and; (4) the ICC's ruling regarding access termination. *Id.* The court granted summary judgment in favor of ICC and the Competing Carriers with respect to Illinois' collocation requirements (which compel AT&T Illinois to permit a competitor to locate and install its own equipment on AT&T Illinois' premises). *Id.* Finally, the court denied all parties' motions for summary judgment with respect to § 13-801's requirements that AT&T Illinois unbundle DS1 and DS3 loops and dedicated transport and dark fiber transport[2], holding that it was unable to determine the extent to which Illinois requirements regarding the unbundling of those network elements were incompatible with federal regulations. *Id.* at 14.

Subsequent to the September 28th order, AT&T Illinois requested that the ICC lift its tariffs with respect to the portions of § 13-801 that the court had ruled were preempted by the Act. The ICC refused to do so; consequently, on April 17, 2007, the court granted AT&T Illinois' motion for injunctive relief (the "April 17th order") with respect to those portions of § 13-801 upon which the court had granted AT&T Illinois summary judgment in its September 28th order.[3] April 17th order at 7. The court also noted in its April 17th order that the ICC had issued an order (the "Wire Center Designation Order" or "WCDO") implementing the new unbundling rules set forth in the FCC's Triennial Review Remand Order ("TRRO") on December 6, 2006; this order became final as to AT&T Illinois on January 24, 2007. April 17th order at 4. According to the court, the

---

[2] DS1 and DS3 loops typically extend from the ILEC's central office to a customer's premises. DS1 and DS3 dedicated transport extend from the ILEC's trunk side of the switch, unbundled from switching or other services, to another location. A DS1 line can carry 24 voice calls simultaneously whereas a DS3 line can carry 28 DS1s (or 672 voice lines). A dark fiber transport is one in which the cables have been put in place but are not connected to switches at either end.
[3] The court noted, however, that although it granted AT&T Illinois permanent injunctive relief upon the issues decided in the September 28th order, the injunction would remain subject to modification pending final judgment on the remaining issues. April 17 order at *7-8.

3

WCDO clarified the ICC's position regarding the unresolved § 13-801 issues in this case, upon which the court had reserved judgment in the September 28th order, rendering the remaining issues ripe and ready for briefing and decision.[4] *Id.* Consequently, these remaining issues being fully briefed by the parties, the court now turns to their consideration.

## II. Background

All parties concede that there are no material facts in dispute in this case and have made cross-motions for summary judgment. Having given a full exposition of the background history of the Act, as well as its subsequent interpretation and implementation by the FCC, in its September 28th order, the court sees no need to rehearse the extensive background of this case and will limit itself to a brief synopsis of the issues at hand.

Briefly, § 251 of the Act obliges local telecommunications carriers such as AT&T Illinois (known as "incumbent local exchange carriers" or "ILECS") to provide new market entrants ("competing local exchange carriers" or "CLECS") with access to certain portions of the ILEC's network infrastructure at just, reasonable, and nondiscriminatory rates. 47 U.S.C. § 251(c)(3). Moreover, such access was to be "unbundled," meaning that CLECs would be able to combine the ILEC's network elements in such a fashion so as to provide telecommunications service to their customers. *Id.* The purpose behind this section of the Act was to break the ILEC's prior statewide monopolies of telecommunications services; Congress realized that new competitors could not

---

[4] The Competing Carrier's argument that AT&T Illinois' motion for summary judgment on these issues is inappropriate and procedurally improper is therefore inapposite.

realistically be expected to duplicate the ILEC's existing telecommunications networks. *See Indiana Bell Tel. Co., Inc. v. McCarty,* 362 F.3d 378, 382 (7th Cir. 2004).

However, not all ILEC network elements need be unbundled for access by CLECs. Section 251(d) of the Act directs the FCC to consider, at a minimum, "whether – (A) access to such network elements as are proprietary in nature is necessary; and (B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer." 47 U.S.C. § 251(d). This latter requirement is known as the "impairment requirement."

Long and mighty were the efforts of the FCC to interpret and implement the impairment requirement. *See Ill. Bell Tel. Co.*, 2006 WL 2796488 at *2-3. Finally, on February 4, 2005, the FCC issued the Triennial Review Remand Order. *See Order on Remand, In the Matter of Unbundled Access to Network Elements*, 20 F.C.C.R. 2533 (2005) (hereinafter "TRRO"). In relevant part, the FCC stated that ILECS no longer have an obligation to provide CLECs with unbundled access to certain network elements. *TRRO* ¶ 199. The FCC found that removal of the unbundling requirement was justified because newer switching technologies were currently available and continued dependence on the ILEC's preexisting infrastructure potentially inhibited the incentive to invest in newer technologies. *Id.* The TRRO was subsequently upheld by the D.C. Circuit in *Covad Communications Co. v. F.C.C.,* 450 F.3d 528 (D.C. Cir. 2006).

Therefore, under the TRRO, the FCC has held that under certain conditions, CLECs are unimpaired and can deploy their own high capacity loop and transport facilities; consequently mandatory access to unbundled ILEC network elements is denied them. *Id.* ¶ 70 (transport); *Id.* ¶ 154 (loops). This applies particularly in high population

or high traffic areas where there are greater opportunities to earn revenue that will offset the cost of deploying new systems. *Id.* ¶ 70 (transport); *Id.* ¶ 154 (loops). The TRRO, which embodies the FCC's latest implementation schema of the Act, analyzes impairment at the level of an ILEC's "wire center." A wire center is an ILEC switching office that terminates and aggregates loop facilities serving a given geographic region. *TRRO* ¶ 87 n. 251; ¶ 155. Specifically, the FCC employs straightforward numeric tests measuring two criteria: (1) the number of ILEC business lines in the wire center (which approximates the number of potential high-capacity consumers) and; (2) the number of "fiber-based collocators" (competing carriers that have obtained collocation space at the incumbent's switch location and then extended their fiber networks into that network). *Id.* ¶¶ 102, 167.

Unlike the FCC's TRRO implementation of the Act, § 13-801 of the IPUA has no impairment requirement. Therefore, ILECs are uniformly subject to § 13-801's unbundling requirement throughout Illinois.[5] 220 ILCS § 5/13-801(d)(1-5).

### III. ANALYSIS

**A. The FCC's Impairment Requirements under the TRRO for DS1 Loops and Transport, D3 loops and Transport, and Dark Fiber Transport.**

The TRRO's unbundling and impairment requirements (and their possible preemption of § 13-801's unbundling requirements) with respect DS1 loops and dedicated transport, DS3 loops and dedicated transport, and dark fiber transport are currently at issue before the court. For DS1 loops, the FCC held that there is no impairment (and, therefore, no unbundling requirement) in those wire center service areas with at least 60,000 business lines and four fiber-based collocators. *Id.* ¶¶ 178, 179. For

---

[5] With the exception of certain rural telephone companies as described in 47 U.S.C. 251(f). 220 ILCS § 5/13-801(h).

DS3 loops, the FCC likewise denies unbundling in any with at least 38,000 business lines and four fiber-based collocators.[6] *Id.* ¶ 174. The FCC's implementing rules state that: "once a wire center exceeds [the applicable] thresholds, no future [DS1 or DS3] loop unbundling will be required in that wire center." 47 C.F.R. § 51.319(a)(4)(i); 47 C.F.R. § 51.319(a)(5)(i) (2007).

With respect to DS1, DS3, and dark fiber dedicated transport, the TRRO establishes a tier-based classification system for wire centers. Tier 1 wire centers have "four or more collocations or … 38,000 or more business lines" as well as "all incumbent LEC switching locations that have no line-side facilities …." *TRRO* ¶ 112. Tier 2 wire centers comprise "those with three or more fiber-based collocations or with 24,000 or greater business lines." *Id.* ¶ 118. Tier 3 wire centers are defined as "all those that are not Tier 1 or Tier 2 wire centers." *Id.* ¶ 123.

For DS1 transport, ILECs "are not obligated to provide unbundled DS1 transport on routes connecting two Tier 1 wire centers" but "are obligated to provide unbundled DS1 transport that originates or terminates in any Tier 2 or Tier 3 wire center." *Id.* ¶ 123. For DS3 and dark fiber transport, ILECs "are obligated to provide unbundled DS3 transport that originates or terminates in any Tier 3 wire center, but are not obligated to provide unbundled DS1 transport on routes connecting any combination of Tier 1 and Tier 2 wire centers." *Id.* ¶¶ 123, 133. For those network elements where ILEC s "are not required to provide unbundled DS1 [or DS3 or dark fiber] transport …, requesting carriers may not obtain new DS1 transport as unbundled network elements. 47 C.F.R. §

---

[6] The FCC imposed a higher impairment threshold on DS1 loops because it recognized that stand-alone DS1 loops offer low revenue opportunities and are thus unlikely to be deployed competitively; however CLECs often can offer DS1-capacity service over existing fiber-optic facilities in place to serve actual or expected higher-capacity customers. TRRO ¶ 178.

51.319(e)(2)(ii)(C) (dedicated DS1 transport);  47 C.F.R. § 51.319(e)(2)(iii)(C) (dedicated DS3 transport); 47 C.F.R. § 51.319(e)(2)(iv)(B) (dark fiber transport).  As with loops, once a wire center is determined to be a Tier 1 or Tier 2 wire center, "that wire center is not subject to later reclassification."  47 C.F.R. § 51.319(e)(3)(i); 47 C.F.R. § 51.319(e)(3)(ii).

Moreover, the FCC recognized that, in addition to the geographically defined wire centers, a CLEC might find sufficient revenue to avoid impairment in other areas, depending upon the volume of loop or transport elements that it seeks.  The TRRO therefore establishes limits on the quantity of loop or transport elements that a CLEC could obtain even in areas where unbundling is required.  Thus, a competitor may obtain a "maximum of 12 unbundled DS3 dedicated transport circuits on each route where DS3 dedicated transport is available on an unbundled basis" or "a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis."  *TRRO* ¶ 128; 47 C.F.R. § 51.319(e)(2)(ii)(B) (DS1 maximum); *TRRO* ¶ 112; 47 C.F.R. § 51.319(e)(2)(iii)(B) (DS3 maximum).  Similarly, the FCC set caps on the number of DS1 loops (ten) and DS3 loops (one) that a CLEC could obtain at any building where unbundled DS3 and DS1 loops are available.  47 C.F.R. § 51.319(a)(4)(ii) (DS1 maximum); 47 C.F.R. § 51.319(a)(5)(ii) (DS3 maximum).

**B. Section 13-801 of the IPUA is Preempted by the TRRO and the Federal Communications Act.**

The TRRO has ruled that under certain conditions in which telecommunications competition is not impaired, ILECs are not obliged under § 251 to provide unbundled access to new market CLECs.  Section 13-801 of the IPUA, however, has no impairment requirements and under that state statute, AT&T Illinois is obligated to provide

51.319(e)(2)(ii)(C) (dedicated DS1 transport);  47 C.F.R. § 51.319(e)(2)(iii)(C) (dedicated DS3 transport); 47 C.F.R. § 51.319(e)(2)(iv)(B) (dark fiber transport).  As with loops, once a wire center is determined to be a Tier 1 or Tier 2 wire center, "that wire center is not subject to later reclassification."  47 C.F.R. § 51.319(e)(3)(i); 47 C.F.R. § 51.319(e)(3)(ii).

Moreover, the FCC recognized that, in addition to the geographically defined wire centers, a CLEC might find sufficient revenue to avoid impairment in other areas, depending upon the volume of loop or transport elements that it seeks.  The TRRO therefore establishes limits on the quantity of loop or transport elements that a CLEC could obtain even in areas where unbundling is required.  Thus, a competitor may obtain a "maximum of 12 unbundled DS3 dedicated transport circuits on each route where DS3 dedicated transport is available on an unbundled basis" or "a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis."  *TRRO* ¶ 128; 47 C.F.R. § 51.319(e)(2)(ii)(B) (DS1 maximum); *TRRO* ¶ 112; 47 C.F.R. § 51.319(e)(2)(iii)(B) (DS3 maximum).  Similarly, the FCC set caps on the number of DS1 loops (ten) and DS3 loops (one) that a CLEC could obtain at any building where unbundled DS3 and DS1 loops are available.  47 C.F.R. § 51.319(a)(4)(ii) (DS1 maximum); 47 C.F.R. § 51.319(a)(5)(ii) (DS3 maximum).

**B. Section 13-801 of the IPUA is Preempted by the TRRO and the Federal Communications Act.**

The TRRO has ruled that under certain conditions in which telecommunications competition is not impaired, ILECs are not obliged under § 251 to provide unbundled access to new market CLECs.  Section 13-801 of the IPUA, however, has no impairment requirements and under that state statute, AT&T Illinois is obligated to provide

51.319(e)(2)(ii)(C) (dedicated DS1 transport);  47 C.F.R. § 51.319(e)(2)(iii)(C) (dedicated DS3 transport); 47 C.F.R. § 51.319(e)(2)(iv)(B) (dark fiber transport).  As with loops, once a wire center is determined to be a Tier 1 or Tier 2 wire center, "that wire center is not subject to later reclassification."  47 C.F.R. § 51.319(e)(3)(i); 47 C.F.R. § 51.319(e)(3)(ii).

Moreover, the FCC recognized that, in addition to the geographically defined wire centers, a CLEC might find sufficient revenue to avoid impairment in other areas, depending upon the volume of loop or transport elements that it seeks.  The TRRO therefore establishes limits on the quantity of loop or transport elements that a CLEC could obtain even in areas where unbundling is required.  Thus, a competitor may obtain a "maximum of 12 unbundled DS3 dedicated transport circuits on each route where DS3 dedicated transport is available on an unbundled basis" or "a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis."  *TRRO* ¶ 128; 47 C.F.R. § 51.319(e)(2)(ii)(B) (DS1 maximum); *TRRO* ¶ 112; 47 C.F.R. § 51.319(e)(2)(iii)(B) (DS3 maximum).  Similarly, the FCC set caps on the number of DS1 loops (ten) and DS3 loops (one) that a CLEC could obtain at any building where unbundled DS3 and DS1 loops are available.  47 C.F.R. § 51.319(a)(4)(ii) (DS1 maximum); 47 C.F.R. § 51.319(a)(5)(ii) (DS3 maximum).

**B. Section 13-801 of the IPUA is Preempted by the TRRO and the Federal Communications Act.**

The TRRO has ruled that under certain conditions in which telecommunications competition is not impaired, ILECs are not obliged under § 251 to provide unbundled access to new market CLECs.  Section 13-801 of the IPUA, however, has no impairment requirements and under that state statute, AT&T Illinois is obligated to provide

unbundled access to its network throughout the state. In its September 28th order, the court held that the Act, as implemented by the FCC preempted the IPUA's § 13-801, removing certain of that section's unbundled access requirements in situations where the Act deemed competitors were not impaired. *Ill. Bell Tel. Co.*, 2006 WL 2796488 at *25. Specifically, § 251 of the Act preempted § 13-801's unbundled access requirements with respect to local circuit switching, switching-related elements, Ocn-level loops and dedicated transport, dark fiber loops, entrance facilities, and feeder subloops. *Id.* at *33. Also preempted were § 13-801's combination requirements compelling AT&T Illinois to provide competitors with pre-existing combinations of network elements, and § 13-801's requirements with respect to splitters, and; (4) the ICC's ruling regarding access termination. *Id.*

In light of the FCC's holdings in the TRRO, the court now holds that § 13-801's unbundled access requirements with respect to DS1 and DS3 loops and dedicated transport and dark fiber transport are similarly preempted by § 251 of the Act. A careful reading of the Act shows why this must be so.

The Act's §§ 251 and 252 set up a complex dual regulatory scheme in which authority over the initial sharing of local facilities owned by the ILECS is divided between the FCC and state authorities. 47 U.S.C §§ 251, 252; *see also Verizon New England, Inc. v. Maine Public Utilities Com'n*, 509 F.3d 1, 7 (1st Cir. 2007). Specifically, the FCC determines what network elements must be unbundled and sets the pricing policy, whereas state commissions oversee the adoption of the agreements providing CLECs access to the ILEC's networks at prices in conformance with the FCC's pricing policy guidelines. 47 U.S.C. §252(a), (b), (e), (f); *Verizon New England*, 509 F.3d

at 7. The price scheme under §§ 251 and 252 that was ultimately determined by the FCC is based on total element long run incremental costs ("TELRIC") a forward-looking measure which is highly favorable to the competitors. 47 CFR §§ 51.503, 51.505 (2007); *see also AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 374 (1999). Disputes as to the adoption of the agreements submitted to the state commissions are heard in federal court. 47 U.S.C. §252(e). In short, both the FCC and the state commissions play major roles in the administration of §§ 251 and 252. And under § 251's impairment requirements, ILECs (such as AT&T Illinois) are not obliged to provide unbundled access to CLECs (such as the defendants Competing Carriers) in those situations wherein competition is not impaired.

The defendants' arguments in this case are largely reheated versions of their arguments made prior to the September 28th order and need not detain the court overly long. The major thrust of the defendant parties' argument is that § 251 of the Act only precludes unbundling at TELRIC pricing in situations where there is no impairment. Nevertheless, according to defendants, § 271 of the Act grants authority to the states to require unbundling in all situations, but under pricing structures that are not necessarily based on TELRIC. However, the statutory language of § 271, its legislative history and underlying policy, as well as the strong majority of precedent, weigh against the defendants' argument.

Section 271 of the Act applies only to those ILECS such as AT&T Illinois (known as "Bell Operating Companies" or "BOCs") that seek to enter the long distance (InterLATA[7]) service market. 47 U.S.C. § 271. As a condition of entering the long

---

[7] InterLATA means telecommunications between a point located in a local access and transport area (LATA) and a point located outside of the area. 47 U.S.C. 153(21).

distance markets, § 271 establishes a fourteen-point "competitive checklist" of requirements that a BOC must meet in order to obtain FCC approval. 47 U.S.C. § 271(c)(2)(B)(i-xiv). Among these requirements is the obligation to unbundle loop, switching and transport elements. *Id.* In contrast to § 251, and similar to IPUA § 13-801, the unbundling requirements of § 271 do not require a finding of CLEC impairment. Moreover, the pricing structure controlling unbundled access to CLECs under § 271 is that which is determined to be "just and reasonable" under 47 U.S.C. § 224, rather than the more advantageous (to the CLECs) TELRIC pricing scheme. Defendants argue that since AT&T Illinois is a BOC that has obtained approval to enter the long distance market, and since § 271 requires AT&T Illinois to furnish unbundled access to CLECs (albeit at non-TELRIC rates), then § 13-801 does not require AT&T Illinois to do any more than is already required by § 271. According to the defendants, the issue before the court is principally one of pricing protocols rather than preemption: unbundling is required either at TELRIC rates (if there is impairment) or "just and reasonable rates" (if there is no finding of impairment).

However, the plain language of § 271 grants authority only to the FCC. The FCC decides whether to grant § 271 approval; the states have no more than a consultative role. 47 U.S.C. § 271(d)(3); 47 U.S.C. § 271(d)(2)(B); *see also Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Com'n.,* 359 F.3d 493, 495 (7th Cir.2004) ("The state commission makes a recommendation, which is merely advisory, as to whether the BOC has satisfied the requirements. The Act reserves to the FCC the authority to decide whether to grant a section 271 application.") (citing *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323 (7th Cir. 2000)). The power to enforce the statute falls squarely

under the FCC's general powers. 47 U.S.C. § 271(d)(6). Moreover, the right to set prices for the unbundled elements derives from the FCC's power to set just and reasonable rates. 47 U.S.C. §§ 201-202; *In re Review of the Section 251 Unbundling Obligations*, 18 F.C.C.R. 19020 ¶ 656 (2003) (the "TRO"); *see also Verizon New England*, 509 F.3d at 7. Thus, the authority to enforce obligatory unbundling by the ILECSs and to set the rates of access to the unbundled network elements under § 271 inheres solely in the FCC and not to the state commissions. There is nothing in § 271 that grants the state commissions anything more than a consultative role. *Verizon New England*, 509 F.3d at 7 ("[C]ross references to §§ 251 and 252 are hardly a delegation of power to the states to implement § 271").

The ICC and the Competing Carriers argue that § 252 (e)(3) preserves a state commission's authority to require compliance with state law. It quotes 47 U.S.C. § 261(b) and (c) in arguing that "'[n]othing in [Part II (§§251-261)]' shall be construed to prohibit any state commissions from prescribing and enforcing regulations to fill the requirements of §§ 251-261 so long as the requirements were not inconsistent with §§251-261, or would preclude a state from imposing requirements on all telecommunications carriers to further competition in the local market, so long as the requirements were not inconsistent with §§ 251-261." ICC's Mot. Summ. J. at 7. That is certainly so, but it does not explicitly grant any authority to the ICC under § 271. Therefore, AT&T Illinois is not obligated by § 251 to permit access to unbundled network elements in situations in which CLECs are not impaired, and the ICC has no authority to compel it to do so under § 271: that power belongs solely to the FCC.

The ICC cites *AT&T Communications of Illinois, Inc. v. Illinois Bell Telephone* as authority for the proposal that 47 U.S.C. § 601(c)(1) explicitly forecloses implied preemption of state authority under the Act. 349 F.3d 402, 410 (7th Cir. 2003). However, *AT&T Communications* is distinguishable from the instant case because it deals with the state's ability (or lack thereof) to determine rate structures for unbundled elements, rather than whether the state can compel unbundling by incumbents in regions where there is no impairment of the CLECs. *Id.* at 406.

Likewise, the ICC's championing of *Verizon New England* does little to aid its argument. 509 F.3d at 1. In that case, the First Circuit held that state public utility commissions (such as the ICC) do not have the authority to determine what unbundled elements an ILEC could be required to provide to competitors, nor could it set the rates. *Id.* at 8-9. The ICC argues that the court merely held that the ICC was preempted from establishing rates using the TELRIC schema; and that the state may use another pricing protocol in requiring unimpaired unbundling of network elements by the ILECS. That, however, is a highly selective reading of the court's opinion. As the court noted; the FCC's delisting of certain conditions under which ILECS are not required to provide unbundled network element access was specifically intended to free the carriers from such compulsion, and state laws requiring ILECS to provide such access regardless of the FCC's intentions are squarely in the way of that intent and are therefore preempted. *Id.* at 8. Likewise, the Competing Carriers' argument that there is no actual conflict is incorrect; § 13-801 arrogates to the state regulatory powers that are explicitly reserved for the FCC.

The ICC argues further that it is not itself trying to enforce § 271 (as indeed it may not do), but rather that the unbundling obligations of § 13-801 hew to the limits of federal law and comport with AT&T Illinois' obligation to adhere to the requirements of § 251 and § 271. However, as the court observed previously, the ICC is attempting, through § 13-801, to accomplish through indirect means what it is clearly prevented from doing directly. *Ill. Bell Tel. Co.*, 2006 WL 2796488 at *23. Section 13-801's unbundling requirement in situations where there is no impairment of the CLECs ability to compete, as defined under the TRRO, poaches squarely upon the regulatory and enforcement powers reserved to the FCC by the Act. It is therefore preempted.

The weight of relevant precedent also militates in favor of a conclusion of preemption. Indeed, nine out of ten district courts (including this court's September 28th order) that have addressed the question of whether states may compel ILEC's to adhere to § 271's requirements have found that they may not; and the sole court to find otherwise was reversed on appeal.[8] Furthermore, the majority of state commissions that have examined this question agree that states are preempted by the Act from enforcing § 271.[9]

---

[8] *See Mich. Bell Tel. Co. v. Lark*, No. 06-11982, 2007 WL 2868633, at *1 (E.D. Mich. Sept. 26, 2007); *BellSouth Telecomms., Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 U.S. Dist. LEXIS 69152, at *49 (E.D. Ky. Sept. 18, 2007); *Qwest Corp. v. Arizona Corp. Comm'n*, 496 F. Supp. 2d 1069, 1077-79 (D. Ariz. 2007); *Illinois Bell Tel. Co. v. O'Connell-Diaz*, No. 05-C-1149, 2006 WL 2796488 at *13-14 (N.D. Ill September 28, 2006); *Dieca Communications, Inc. v. Florida Pub. Serv. Comm'n*, 447 F. Supp. 2d 1281, 1285-86 (N.D. Fla. 2006); *Southwestern Bell Tel., L.P. v. Missouri Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1066-69 (E.D. Mo. 2006); *BellSouth Telecomms., Inc. v. Mississippi Pub. Serv. Comm'n*, 386 F. Supp. 2d 557, 565-66 (S.D. Miss. 2005); *Verizon New England, v. New Hampshire Pub. Utils. Comm'n*, No. 05-cv-94, 2006, WL 2433249, at *8 (D.N.H. Aug. 22, 2006), *aff'd Verizon New England,* 2007 WL 2509863, at *5; *BellSouth Telecomms., Inc. v. Ga. Pub. Serv. Comm'n*, 1:06-CV-00162-CC, slip op. at 15 (N.D. Ga. Jan. 3, 2008). *But see Verizon New England Inc. v. Maine Public Utilities Com'n*, 441 F.Supp.2d 147, 158 (D. Me. 2006) *rev'd Verizon New England,* 2007 WL 2509863, at *5.

[9] *See, e.g.,* Arkansas, Docket No. 05-081-U, Order No. 5, 2005 WL 3778675, at *2 (Ark.P.S.C. Oct. 31, 2005) ("Although SBC should provide the items specified in section 271 and the TRO, this Commission has no jurisdiction to enforce section 271."); Indiana, Cause No. 42857, 2006 Ind. PUC LEXIS 40, at *88-*89 (Ind. Util. Reg. Comm'n Jan. 11, 2006) ("[S]tate commissions have no jurisdiction to enforce or determine the requirements of Section 271."); North Dakota, Case No. PU-05-165, 2006 N.D. PUC LEXIS

Because § 13-801 requires unbundling of AT&T Illinois' network elements to the Competing Carriers, even in situations in which § 251 of the Act do not require the providing of unbundled access to unimpaired CLECs, and because the authority to require unbundling under § 271 is reserved only to the FCC, the court holds that § 13-801 impermissibly preempts the Act, and AT&T Illinois' motion for summary judgment with respect to § 13-801's requirements that AT&T Illinois unbundle DS1 and DS3 loops and dedicated transport and dark fiber transport is granted.

The remainder of the issues raised by AT&T Illinois' motion for summary judgment need not detain the court for long. Since this order resolves those issues left unresolved by the September 28th order, there remain no outstanding issues to be adjudicated. Therefore, the court enters final declaratory judgment in this case in favor of AT&T Illinois. Moreover, the court granted AT&T Illinois' motion for injunctive relief in its order of April 17th with the proviso that the granted relief could be modified by subsequent rulings of this court. April 17th order at 7. Accordingly, the April 17th order granting injunctive relief is modified. Specifically, the ICC is hereby enjoined from enforcing § 13-801, any ICC order implementing § 13-801, or any tariff implementing such ICC order or § 13-801, to the extent they purport to require AT&T Illinois to:

1. "unbundl[e] . . . local circuit switching, switching-related elements, OCn-level loops, [OCn-level] dedicated transport, dark fiber loops, entrance facilities, [or] feeder subloops";

2. unbundle DS1 or DS3 loops, or DS1, DS3, or dark fiber dedicated transport either

---

3, at *22-*23 (N.D.P.U.C. Feb. 8, 2006) ("The FCC has the exclusive authority to determine whether Qwest has complied with the substantive provisions of Section 271 including the checklist provisions.").

(i) in or between wire centers that the ICC, the FCC, or a court of competent jurisdiction has determined to satisfy the applicable federal non-impairment criteria set forth in 47 C.F.R.§ 51.319(a)(4), (a)(5), or (e)(2), including the wire centers designated as non-impaired pursuant to the WCDO; or (ii) at quantities exceeding the applicable federal limits set forth in 47 C.F.R. § 51.319(a)(4), (a)(5), or (e)(2);

3. "furnish CLECs [competing local exchange carriers] with preexisting combinations of network elements" that include any one or more of the network elements or items described in sub-paragraphs 12(a), (b), (c) or (d), or "combine [such] network elements for CLECs";

4. "unbundle splitters";

5. provide "terminating access" on an unbundled basis or unbundle the "terminating switch."

### IV. CONCLUSION

For the reasons set forth above, AT&T Illinois' motion is granted and Defendants' motions are denied. The court accordingly enters final declaratory judgment in favor of AT&T Illinois and modifies its April 17, 2007 order granting injunctive relief to Illinois Bell Telephone Company in conformance with the order above. Defendants' and Defendants-Intervenors' cross-motions for summary judgment are consequently denied.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: January 28, 2008